UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BRIAN E. KADER,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT DOOLEY, DIRECTOR OF PRISON OPERATIONS AND WARDEN, MIKE DURFEE STATE PRISON, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; JOSH KLIMEK, UNIT MANAGER, WEST CRAWFORD HALL, MIKE DURFEE STATE PRISON, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; UNKNOWN DEPARTMENT OF CORRECTIONS STAFF, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITY; UNKNOWN MIKE DURFEE STATE PRISON MAILROOM STAFF, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITY; AND MIKE GROSSHUESCH, MIKE DURFEE STATE PRISON MAIL ROOM SUPERVISOR, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY;<br><br>Defendants. | 4:17-CV-04106-KES<br><br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION |

**INTRODUCTION**

Plaintiff, Brian E. Kader, is an inmate at Mike Durfee State Prison (MDSP) in Springfield, South Dakota. On August 2, 2017, Kader filed a pro se civil rights lawsuit under 42 U.S.C. § 1983. Docket 1. The court screened Kader's original complaint under 28 U.S.C. § 1915A and dismissed it without

prejudice. Docket 11. On February 16, 2018, Kader moved to amend his complaint and for reconsideration of the court's order dismissing the case. Dockets 15, 16. The court screened Kader's amended complaint under 28 U.S.C. § 1915A and dismissed Kader's complaint in part and directed service in part. Docket 18. The court denied Kader's motion for reconsideration. *Id.* The amended complaint was docketed on September 25, 2018. Docket 19.

In Kader's amended complaint, he alleged that defendants Mike Grosshuesch and Unknown Mailroom Staff at MDSP and the South Dakota State Penitentiary (SDSP) violated Kader's First Amendment rights by censoring his magazine subscriptions. Docket 19 ¶¶ 56-57, 61. Kader also alleged that defendants Robert Dooley and Josh Klimek are subjecting Kader to cruel and unusual punishment in violation of his Eighth Amendment rights. *Id.* ¶ 60.

Defendants Dooley, Grosshuesch, and Klimek filed an amended answer to Kader's amended complaint. Docket 38. Defendants now move for summary judgment based on qualified immunity. Docket 55. Kader filed a motion for sanctions, a motion to extend the time to answer the motion for summary judgment, and a motion to appoint counsel. Dockets 71, 74, 75. The court denied Kader's motion for sanctions and motion to appoint counsel but granted the motion to extend, so Kader's response was due by May 3, 2019. Docket 76. On March 28, 2019, Kader moved for reconsideration of the court's order on the motion for sanctions and to appoint counsel. Docket 78. Kader still has not responded to the motion for summary judgment.

# FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Kader as the nonmoving party, including the defendants' statement of undisputed material facts, which Kader did not object to, the facts are:[1]

Kader states that defendants Dooley and Klimek are "subjecting inmates to cruel and unusual punishment by failing to provided [sic] some type of ventilation or air conditioning in the housing units." Docket 19 ¶ 60. Kader claims he has pulmonary disease and takes numerous medications for his condition. *Id.* ¶ 41. Kader alleges that the excessive heat and humidity make it difficult for him to breathe, hampering "his body's ability to thermoregulate." *Id.* at ¶¶ 41, 43. Kader claims that he "chooses not to eat on many days due to the heat index, which is much higher inside the dining hall, due to the dishwashers running constantly." *Id.* ¶ 44.

Kader currently resides in the West Crawford Hall at MDSP. *Id.* ¶ 40. West Crawford Hall has large exhaust fans installed and mounted in the windows on each end of the hallways. Docket 68 ¶ 35; *see also* Dockets 56-5, 56-70. There are mounted wall fans in each individual housing unit to help circulate the air, and inmates housed in West Crawford Hall can have portable fans to help circulate the air within the unit. Docket 68 ¶ 36. Inmates can, if determined by Health Services to be medically necessary, have a portable air-

---

[1] Under Local Rule 56.1.D, "[a]ll material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts."

conditioning unit in their room. *Id.* ¶ 37. Also, if an inmate has a medical condition that is exacerbated by the heat, air-conditioned rooms can be provided upon a physician's order. *Id.* ¶ 43. Kader states that there is no air-conditioning or ventilation in the dining hall, only fans. Docket 19 ¶ 44. Kader says that "when the heat index is high, the dining hall becomes intolerable." *Id.* Although not air-conditioned, the dining hall is equipped with an air-handling system and has fans mounted on the walls near the exit doors to help circulate the air. Docket 68 ¶ 66.

MDSP staff monitor and document the temperatures inside the housing units daily during the summer months and adjust inmate movement as needed. *Id.* ¶ 38. During the period of July 11, 2017, to August 31, 2017, the temperatures recorded in West Crawford Hall reached or exceeded 90 degrees on two occasions. *Id.* ¶ 40; *see also* Dockets 56-6–56-56. On July 17, 2017, the recorded high-temperature inside West Crawford Hall was 91 degrees. Docket 68 ¶ 41; *see also* Docket 56-12. On July 25, 2017, the recorded high-temperature inside West Crawford Hall was 90 degrees. Docket 68 ¶ 41; *see also* Docket 56-20. The recorded temperatures inside West Crawford Hall did not exceed 100 degrees between July 11 through July 29, 2017, or between July 31 through August 31, 2017. Docket 68 ¶¶ 40-42; *see also* Dockets 56-6–56-56. The temperature for July 30, 2017, is unknown to this court, because the daily temperature log for that date was not presented with the other temperature log exhibits. *See* Dockets 56-6–56-56.

Kader has never asked for or received a medical order for an air-conditioned room. Docket 68 ¶ 44. Kader has not indicated or complained to Health Services that the temperatures in West Crawford Hall have "inhibit[ed] his breathing or hamper[ed] his body's ability to thermoregulate." *Id.* ¶ 45; *see also* Dockets 56-57–56-62. Health Services recorded Kader's respiratory effort as "unlabored" on several occasions. Docket 68 ¶ 48; *see also* Dockets 56-57–56-59. Kader told medical staff repeatedly that "his breathing has been excellent," and "he can't even remember when his peak flows were so good." Docket 68 ¶ 50; *see also* Dockets 56-58, 56-59. Kader also indicated to medical staff that he "maybe uses his rescue inhaler four times a month" and that he does not have any respiratory issues during the day. Docket 68 ¶ 54; *see also* Dockets 56-59, 56-60.

Kader states that defendant Klimek "has instituted a policy requiring inmates to keep their doors closed until count clears," which Kader says is "ridiculous" and "cruel." Docket 19 ¶ 51. OM 3.3.A.6, Count Principles and Procedures, implemented by former Warden Dooley, states "after the inmate is identified, he will return to his room and close the door . . . until count is cleared." Docket 68 ¶¶ 62-63. The policy was implemented to keep noise levels down until prison staff finishes count and the process typically takes five (5) to ten (10) minutes. *Id.* ¶¶ 64-65.

Along with his allegations of heat and lack of ventilation, Kader also asserts that MDSP is overcrowded and that defendants have "added to the population of West Crawford Hall and the entire Mike Durfee State Prison

facility without increasing the available restroom facilities." Docket 19 ¶ 47. Kader claims that "there are only three toilets, three urinals, and five sinks in the restrooms" in West Crawford Hall and that "[o]vercrowding and lines to relieve oneself are common." *Id.* Kader also alleges that "the Department of Corrections has further limited inmates' shower facilities" when it made a handicap shower. *Id.* ¶ 48.

There are sixty-six inmates housed on the first floor of West Crawford. Docket 68 ¶ 70; *see also* Docket 19 ¶ 47. There are three urinals, four toilets, and five sinks located on each floor of West Crawford Hall. Docket 68 ¶ 69; *see also* Dockets 56-63–56-65. Kader has not complained to Unit Staff or filed any grievances stating that the "lines to relieve oneself" have caused him to wait long periods of time to use the toilet or use the shower. Docket 68 ¶¶ 71-72. There are no records indicating that Kader has ever reported to Unit Staff that he was unable to use the toilet or shower because of waiting in line. *Id.*

Kader alleges that "[w]hen the showers are running in West Crawford, there is no ventilation to remove the humidity and condensation from the hot water." Docket 19 ¶ 45. Kader also claims that "the shower is full of black mold and mildew and the paint is peeling off the ceiling due to being improperly installed and constantly wet." *Id.* ¶ 46. A new exhaust fan was recently installed in all the showers and is believed to help alleviate the humidity. Docket 68 ¶ 74. The showers are cleaned regularly with cleaning solutions containing bleach. *Id.* ¶¶ 75-76; *see also* Docket 56-66. The MDSP showers are inspected annually by both the Office of State Engineer and the Office of Risk

6

Management for "hazard identification." Docket 68 ¶ 77. Neither office has reported or mentioned the showers being full of black mold. *Id.* Kader has not reported to Health Services any symptoms stemming from the alleged mold and has not sought medical treatment. *Id.* ¶ 78.

Finally, Kader alleges that he was subjected to cruel and unusual punishment because of the laundry services at MDSP. Docket 19 ¶ 49. Kader asserts that "laundry is frequently returned wet and unclean" because the "laundry workers are forced to overload machines and cut the drying cycles short because there is too much laundry and not enough machines." *Id.* When prison officials were notified of complaints that laundry was being returned to inmates still damp or wet, the officials determined that the problem was the "result of prisoners over-stuffing their laundry bags or tying the bag improperly." Docket 68 ¶ 93. On around May 23, 2017, inmates were notified that "in an effort to ensure laundry is returned to the housing units dry, effective immediately, any laundry bag received in laundry that exceeds the listed number of items will be returned to the housing unit unlaundered." *Id.* ¶¶ 94-95; *see also* Docket 56-69. The inmates were also notified that "[a]ny bag that is tied tightly at the bottom of the bag prohibiting the items from drying will be returned unlaundered." *Id.* MDSP has a protocol of washing and drying inmate laundry so it is transported back to inmates clean. Docket 68 ¶¶ 82-92.

Kader asserts that "[d]ue to numerous inmate complaints about underwear coming back unclean, instead of fixing the problem, the Department

of Corrections began issuing brown boxers to hide urine and fecal stains."
Docket 19 ¶ 50. Prison Industries at SDSP decided to switch to brown fabric
when making boxers so that there was only one fabric of boxer shorts used by
all inmates regardless of where they are housed. Docket 68 ¶¶ 100-104. The
decision was made because it would be more efficient to create the boxers out
of just one color for all the inmates housed within the custody of the South
Dakota Department of Corrections (SDDOC). *Id.* The brown fabric now used is
believed to be a better quality of material than the previous boxers made with
white fabric. *Id.*

On January 24, 2018, Kader, in an Informal Resolution Request,
complained that his laundry "always comes back wet" and "also comes back
occasionally more stained and soiled in appearance than when it left." *Id.* ¶ 96;
*see* Docket 56-67. On January 30, 2018, an Informal Resolution Response to
Kader indicated "[i]f laundry bags are packed according to policy by all
inmates, laundry would be returned clean and dry." Docket 68 ¶ 97; *see*
Docket 56-68. Kader's Institutional File reflects Kader did not file a Request for
Administrative Remedy, which is the second step of the grievance process in
place at MDSP. Docket 68 ¶ 98.

## LEGAL STANDARD

Pro se filings must be liberally construed. *Erickson v. Pardus*, 551 U.S.
89, 94 (2007) (citation omitted). Even with this construction, "a pro se [filing]
must contain specific facts supporting its conclusions." *Martin v. Sargent*, 780
F.2d 1334, 1337 (8th Cir. 1985); *see also Ellis v. City of Minneapolis*, 518 F.

8

App'x 502, 504 (8th Cir. 2013). Summary judgment on all or part of a claim is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Craig*, 144 F.3d 593, 595 (8th Cir. 1998). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "Further, 'the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, the dispute must be outcome determinative under prevailing law.' " *Mosley*, 415 F.3d at 910-11 (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)). The facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## DISCUSSION

### I.    Qualified Immunity

Defendants, in their individual capacity, move for summary judgment based on qualified immunity. Docket 55. To show a prima facie case under 42 U.S.C. § 1983, Kader must show "(1) that the defendant(s) acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (citation omitted). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a government official is entitled to qualified immunity the court asks (1) whether the facts alleged, viewed in the light most favorable to the plaintiff, demonstrate the official's conduct violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court may address the elements in any order and if either of the elements are not met, then the official is entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### II.    Mailroom Censorship

Kader alleges that defendants violated his First Amendment rights by censoring his magazine subscriptions. Docket 19 at 10. Specifically, Kader

claims SDSP and Mike Grosshuesch, supervisor of the Mike Durfee State Prison Mailroom, "wrongfully censored [his] subscription to '*Archeology*' magazine because of terra cotta clay statues, art, or figurines depicting nudity." Docket 19 ¶ 57. Kader also alleges that "the South Dakota State Penitentiary Mailroom has censored [his] subscription to '*Wired*' Magazine based on sexually explicit content." *Id.* ¶ 56.

Mailroom staff at MDSP reviewed the record for all Rejection Notices issued to inmates since May 13, 2016, the date of Kader's arrival at MDSP, and found that no Rejection Notice was issued to Kader during the period of May 13, 2016, to August 2, 2017, the date that he filed the present lawsuit. Docket 68 ¶¶ 12-14. The SDSP Mailroom, in Sioux Falls, South Dakota, rejected the March and June 2015 editions of "*Wired*" as being sexually explicit content. *Id.* ¶¶ 16-17. The September/October 2013 edition of "*Biblical Archeology Review*" was rejected by the SDSP Mailroom for sexually explicit content on page 20. *Id.* ¶¶ 24-25; *see also* Docket 56-2.

Defendants contend that Kader has not properly exhausted his mailroom censorship claims through the South Dakota Department of Corrections (SDDOC) grievance process, and as a result his claims must be dismissed. Docket 56 at 10-11. "An inmate must exhaust all available administrative remedies before bringing a § 1983 suit." *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) (citing 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 211 (2007); *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014)). "Available remedies are 'capable of use for the accomplishment of a purpose: immediately

utilizable [and] accessible.' " *Id.* (quoting *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001)).

An inmate must pursue the " 'grievance process to its final stage' to 'an adverse decision on the merits.' " *Id.* (quoting *Burns*, 752 F.3d at 1141). In *Jones v. Bock*, the Supreme Court concluded that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." 549 U.S. 199, 218 (2007) (internal quotation marks and citation omitted). The inmate's subjective belief that there is no point in pursuing the process is immaterial. *Porter*, 781 F.3d at 452 (citing *Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2002)). "Nonexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." *Id.* at 451 (citing *Jones*, 549 U.S. at 211–12). It is reversible error for the district court to proceed to the merits of a prison condition claim if the prisoner has not exhausted all his available remedies. *Benjamin v. Ward Cty.*, 632 Fed. Appx. 301, 301 (8th Cir. 2016) (per curiam).

This court has previously recognized that the grievance procedure in place for SDDOC involves a "two-step" process. *Sisney v. Reisch*, 2007 WL 951858, at *2 (D.S.D. Mar. 26, 2007); *see also Bauer v. Glaser*, 2017 WL 435755, at *2 (D.S.D. Feb. 1, 2017). "First, an inmate must attempt to informally resolve his complaint. If the inmate is unable to resolve the complaint verbally, he is to submit an Informal Resolution Request form . . . ." *Sisney*, 2007 WL 951858, at *2. If the inmate is not satisfied with the response

to the Informal Resolution Request, within ten days of receiving that response, he is required to complete and turn in a Request for Administrative Remedy. *See Cody v. McDonald*, 2015 WL 13732653, at *3 (D.S.D. Nov. 12, 2015).

Kader needed to "tak[e] advantage of each step the prison holds out for resolving the claim internally" to properly exhaust his administrative remedies. *Whiting v. Bear*, 2016 WL 297435, at *4 (D.S.D. Jan. 22, 2016) (internal quotation omitted). Here, Kader filed an Informal Resolution Request regarding the June 2015 issue of "*Wired*" Magazine (Docket 68 ¶ 19), but failed to pursue a Request for Administrative Remedy after receiving an Informal Resolution Response on June 2, 2015. Docket 68 ¶¶ 19-26; *see also* Dockets 56-1. With regard to the September/October 2013 edition of "Biblical Archeology Review," the March edition of *Wired* Magazine, and any other magazine subscriptions that were allegedly censored, Kader failed to file an Informal Resolution Request or a Request for Administrative Remedy. Thus, because Kader failed to properly exhaust his administrative remedies, defendants are entitled to summary judgment as to the mailroom censorship portion of Kader's complaint.

### III. Cruel and Unusual Punishment

To sufficiently allege that the conditions of confinement violate the Eighth Amendment, Kader must assert that the alleged deprivation resulted "in the denial of the minimal civilized measure of life's necessities" and that prison officials were deliberately indifferent to "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation

omitted); *see also Dalrymple v. Dooley*, 2014 WL 4987596, at *5 (D.S.D. Oct. 6, 2014); *Schmidt v. Lentsch*, 2015 WL 2092575, at *2 (D.S.D. May 5, 2015). First, under the objective component, "[w]hether conditions at a specific prison are unconstitutional necessitates a factual inquiry about the specific conditions at that facility." *Patchette v. Nix*, 952 F.2d 158, 163 (8th Cir. 1991). An inmate must show that a condition of confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety. *Helling v. McKinney*, 509 U.S. 25, 35 (1993). The Supreme Court has listed "food, clothing, shelter, medical care and reasonable safety" as minimal civilized measures. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).

Second, under the subjective component, the inmate must show that the defendant prison officials "acted with a sufficiently culpable state of mind" in relation to the prison condition. *Hudson v. McMillian*, 503 U.S. 1, 20 (1992). A " 'should-have-known' standard, is not sufficient to support a finding of deliberate indifference." *Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998) (citing *Farmer*, 511 U.S. at 837). A prisoner need not show that the prison official acted with "the very purpose of causing harm or with knowledge that harm [would] result." *Farmer*, 511 U.S. at 835. A prisoner need only show that the prison official knew of and disregarded "an excessive risk to inmate health or safety." *Id.* at 837.

### A. Heat/Ventilation

Kader alleges that defendants Dooley and Klimek are "subjecting inmates to cruel and unusual punishment by failing to provide some type of ventilation

14

or air conditioning in the housing units." Docket 19 ¶ 60. Kader also alleges that "there is no ventilation in the dining hall, only fans, which circulate the over-heated air." *Id.* ¶ 44. Kader alleges that "there is no ventilation whatsoever in West Crawford." *Id.* ¶ 40. Kader alleges that defendant Klimek requires inmates to close their doors when MDSP is excessively hot. *Id.* ¶ 51. Kader claims that the heat makes it difficult for him to breathe and causes him significant heat stress, affecting his pulmonary disease. *Id.* ¶¶ 41-44.

"[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.' " *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (quoting *Farmer*, 511 U.S. at 832). Prisons need not be "free of discomfort." *Cody v. Hillard*, 830 F.2d 912, 916 (8th Cir. 1987). " '[O]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.' " *Montrose v. Dooley*, 2012 WL 5509625, at *4 (D.S.D. Nov. 14, 2012) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Hot temperatures alone are not a sufficiently severe deprivation that satisfies the objective component of a cruel and unusual punishment claim. *See Chandler v. Crosby*, 379 F.3d 1278, 1297 (11th Cir. 2004) (holding a prisoner's allegation failed to satisfy the objective requirement of an Eighth Amendment violation when inmates in the prison "may have experienced temperatures over ninety degrees nine percent of the time during the months of July and August . . . ."). But inadequate ventilation has been sufficient to state a claim under the Eighth Amendment, especially when paired with a health

condition. *See Williams v. White*, 897 F.2d 942, 944-945 (8th Cir. 1990) (holding that no ventilation or air from the outside was a sufficient claim). "[C]onstitutionally adequate housing is not denied simply by uncomfortable temperatures inside cells, unless it is shown that the situation endangers inmate health." *Grubbs v. Bradley*, 552 F. Supp. 1052, 1122-23 (M.D. Tenn. 1982) (citation omitted). An inmate must be able to "prove that as a result of the extreme heat . . . he suffered deleterious effects on his health beyond mere discomfort." *Freeman v. Wisconsin Dep't of Corr.*, 2002 WL 32344436, at *4 (W.D. Wis. Sept. 10, 2002).

MDSP staff monitor and document the temperatures inside the housing units daily during the summer months and adjust inmate movement as needed. Docket 68 ¶ 38. During the period of July 11, 2017, to August 31, 2017, the temperatures recorded in West Crawford Hall reached or exceeded 90 degrees on two occasions. *Id.* ¶ 40; *see also* Dockets 56-12, 56-20. On July 17, 2017, the recorded high-temperature inside West Crawford Hall was 91 degrees. Docket 68 ¶ 41; *see also* Docket 56-12. On July 25, 2017, the recorded high-temperature inside West Crawford Hall was 90 degrees. *Id.*; *see also* Docket 56-20. At no point during the period of July 11 to August 31, 2017, did a recorded temperature exceed 100 degrees in West Crawford Hall. Docket 68 ¶ 42; *see also* Dockets 56-6–56-56.

The Housing Unit that Kader resides in, West Crawford Hall, has large exhaust fans mounted in the windows at the end of each hallway. Docket 68 ¶ 35; *see also* Dockets 56-5, 56-70. There are wall mounted fans in each

16

individual housing unit to help circulate the air. Docket 68 ¶ 36. This court has previously noted that each room in West Crawford Hall is equipped with at least "one fan." *Brakeall v. Stanwick-Klemick*, 2017 WL 6278872, at *2 (D.S.D. Dec. 8, 2017). Inmates housed in West Crawford can have portable fans to help move the air inside the unit. Docket 68 ¶ 36. If determined by Health Services to be medically necessary, inmates can have a portable air-conditioning unit in their room. *Id.* ¶ 37. MDSP's practice continues to be, "[i]f an inmate suffers from a severe medical condition that is exacerbated by the heat, air-conditioned rooms are provided upon an order from a physician." *Dalrymple*, 2014 WL 4987596, at *5

Although Kader was regularly seen by Health Services in connection with his asthma, the record reflects that Kader never reported to Health Services the temperatures in his Housing Unit "inhibit[ed] his breathing and hamper[ed] his body's ability to thermoregulate." Docket 68 ¶¶ 44-54; *see also* Dockets 56-57–56-62. Kader did not ask for or receive a medical order indicating that he should be housed in a room with air-conditioning. Docket 68 ¶ 44. Kader informed Health Services multiple times that "his breathing has been excellent" and Health Services repeatedly noted his "respiratory effort" was "unlabored." *Id.* ¶¶ 48-50; *see also* Dockets 56-57–56-63. Kader also informed Health Services that he "does not have any respiratory issues during the day." Docket 68 ¶ 56; *see also* Docket 56-61. There is nothing in Kader's medical records that would suggest that the high temperatures and humidity were inhibiting

Kader's breathing or hampering his body's ability to thermoregulate. *See* Dockets 56-57–56-62.

Despite Kader's allegations that there is no ventilation in the dining hall, the record reflects that, while the dining hall is not air-conditioned, there is an air-handling system that helps circulate the air in the room. Docket 68 ¶ 66. There are also mounted fans on the walls near the exit doors of the dining hall to help with air circulation. *Id.* ¶¶ 35-36; *see also* Dockets 56-5; 56-70. Also, there are various areas within MDSP that are air-conditioned and where inmates can go if in need of a respite from the heat. *Dalrymple*, 2014 WL 4987596, at *5. The court in *Dalrymple* found that there was no violation of a defendant's constitutional right to humane conditions during confinement when there are air-conditioned rooms available to inmates who suffer from medical conditions exacerbated by heat. *Id.* Because Kader has not claimed an injury due to the heat, he has not shown a violation of his right to be free from inhumane conditions based on the lack of air-conditioning.

Kader alleges that defendant Klimek "has instituted a policy requiring inmates to keep their doors closed until count clears," which Kader claims is "ridiculous" and makes it difficult for him to breathe. Docket 19 ¶ 51. OM 3.3.A.6, a count policy implemented by former Warden Dooley, states that, "after the inmate is identified, he will return to his room and close the door . . . until count is cleared." Docket 68 ¶¶ 62-63. The policy was implemented to keep noise levels down until prison staff finishes count and the process typically takes five to ten minutes. *Id.* ¶¶ 64-65. The policy is "reasonably

related to the legitimate penological objectives set forth for the policy as articulated by prison officials." *Bell v. Young*, 2018 WL 3148385, at *32 (D.S.D. June 27, 2018); *see also Dean v. Bowersox*, 2013 WL 11322613, at *8 (W.D. Mo. Aug. 29, 2013). Kader has not shown that the policy violates his constitutional right to be free from inhumane conditions.

The record reflects that there is adequate ventilation in the prison and that Kader did not suffer an excessive risk to his health or safety. Despite Kader's conclusory allegations, the conditions and temperatures of the prison are carefully monitored by prison staff, with temperatures exceeding 90 degrees only twice in the summer 2017 months. Kader never complained about the temperatures as inhibiting his breathing to medical staff and has not shown that he was in danger of any health risk or harm beyond mere discomfort. Thus, because there has been no constitutional violation, defendants are entitled to summary judgment as to the heat/lack of ventilation claims of Kader's complaint.

### B. Overcrowding

Kader claims that he was subjected to cruel and unusual punishment because of overcrowding at MDSP. Docket 19 ¶¶ 47-48. Kader claims that "there are only three toilets, three urinals, and five sinks in the restrooms" in West Crawford Hall and that "[o]vercrowding and lines to relieve oneself are common." *Id*. Kader alleges that "[t]he building was designed as a college dormitory and planned for 36 students on the first floor." *Id*. Kader also alleges

that "the Department of Corrections has further limited inmates' shower facilities" when it made a handicap shower. *Id.* ¶ 48.

"[R]easonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner protected by the Eighth Amendment[.]" *Whitnack v. Douglas Cty.*, 16 F.3d 954, 958 (8th Cir. 1994). But it has been established that "[o]vercrowding alone does not describe a constitutional violation." *Garner v. Lisenbe*, 2018 WL 2445581, at *2 (E.D. Mo. May 31, 2018) (citing *Patchette*, 952 F.2d at 163). "Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Rouse v. Caruso*, 2011 WL 918327, at *12 (E.D. Mich. Feb. 18, 2011) (citing *Hudson*, 503 U.S. at 8-9); s*ee also Cass v. Reisch*, 2011 WL 1578579, at *2 (D.S.D. Apr. 26, 2011). The conditions alleged by the defendant must "evince the 'wanton and unnecessary infliction of pain' necessary to constitute a violation of the Eighth Amendment." *Cody v. Hillard*, 830 F.2d 912, 914 (8th Cir. 1987) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

"The United States Constitution does not specify the number of toilets required in a prison cell." *Mann v. Terris*, 2014 WL 2515290, at *3 (E.D. Mich. June 4, 2014) (internal quotation omitted). In *Patchette*, the Eighth Circuit held that a prison facility that had one toilet for every twenty-four inmates did not violate the Eighth Amendment. 952 F.2d at 163-64. In *Reisch*, however, one

urinal for nearly fifty inmates exceeded the Eighth Circuit's threshold in *Patchette*. 2011 WL 1578579, at *2 (citing *Patchette*, 952 F.2d at 163-64).

There are three urinals, four toilets, and five sinks located on each floor of West Crawford Hall. Docket 68 ¶¶ 68-69; *see also* Dockets 56-63–56-65. Kader and defendants both acknowledge that there are "sixty-six inmates housed on the first floor of West Crawford." Docket 19 ¶ 47; Docket 68 ¶ 70. The ratio of four toilets for sixty-six inmates is within the "threshold" stated in *Patchette* and does not violate the Eighth Amendment. *See Patchette*, 952 F.2d at 163-64. That ratio does not include the three urinals.

Kader did not allege and has not shown that he was unable to use the toilet when it was necessary for him to do so. *See Hamblin v. Steed*, 2013 WL 791468, at *5 (W.D. Ark. Jan. 30, 2013) (stating that there was no genuine issue of fact as to whether the lack of available toilet facilities led to deprivation of rights as the plaintiff did not allege that he was unable to utilize the toilet when it was necessary for him to do so). Kader has not shown that the "lines to relieve oneself" have caused him to wait extended periods of time to use the toilet. Kader never reported to Unit Staff at MDSP that he was unable to use the toilet because of lines. Docket 68 ¶ 71. Conditions of confinement that cause mere discomfort or inconvenience do not amount to cruel and unusual punishment. *Rouse*, 2011 WL 918327, at *12. " '[T]he Eighth Amendment does not require that prisoners enjoy immediately available . . . toilets.' " *Id.* (quoting *Abdur-Raheem-X v. McGinnis*, 1999 WL 1045069, at *2 (6th Cir. 1999)). For example, in *Miles v. Bell*, the court found that "there is no specific evidence of

21

significant adverse health effects caused by waiting to use toilet facilities." 621 F. Supp. 51, 61 (D. Conn. 1985). The court in *Smith v. Brady* found that plaintiff's allegations that there was a line to use the restroom was not a deprivation of the minimal civilized measure of life's necessities. 2018 WL 1787740, at *2 (W.D. Ky. Apr. 13, 2018). Although Kader may have been inconvenienced by having to wait in line to use the toilet at times, Kader has not shown that defendants violated his Eighth Amendment rights.

Kader also complains that he was forced to share three showerheads with "nearly seventy inmates," but has not shown that he suffered any harm because of the alleged overcrowded conditions. Docket 19 ¶ 48. Applying the "threshold" set in *Patchette*, defendants would need only to provide three showerheads for seventy-two inmates. Because there are sixty-six inmates housed on the first floor of West Crawford Hall, defendants did not exceed the *Patchette* "threshold." 952 F.2d at 163-64. Also, other courts have followed a higher ratio when dealing with the number of available showerheads as opposed to toilets. The court in *Miles* found that fourteen to twenty-four inmates sharing a single showerhead did not establish an Eighth Amendment violation. 621 F. Supp. at 58-62. And the court in *Bradley v. Miller* found that thirty to forty inmates sharing one shower was not an Eighth Amendment violation. 2015 WL 6757022, at *5 (W.D. Pa. Nov. 5, 2015).

Kader has not filed a grievance claiming that he was denied the opportunity to shower because of the number of inmates waiting in line. Docket 68 ¶ 72. Kader has not shown that he was unable to shower or was

22

denied the opportunity to shower because of the number of inmates in line. *Id.*
Although Kader may find the conditions of his confinement unpleasant, Kader
has not shown that those conditions have risen to the level of a constitutional
violation and denied him the minimal civilized measure of life's necessities.
Thus, defendants are entitled to summary judgment as to the overcrowding
claims of Kader's complaint.

### C. Shower Sanitation

Kader alleges that "[w]hen the showers are running in West Crawford,
there is no ventilation to remove the humidity and condensation from the hot
water . . . ." Docket 19 ¶ 45. The evidence shows that a new exhaust fan was
installed in all the showers and staff at MDSP believe the fan will help alleviate
the humidity Kader mentioned in his complaint. Docket 68 ¶ 74.  Kader also
claims that "[t]he shower is full of black mold and mildew and the paint is
peeling off the ceiling due to being improperly installed." Docket 19 ¶ 46.
Despite Kader's claim to the contrary, based on the undisputed statement of
material facts, the shower is not "full of black mold and mildew." Docket
68 ¶ 75; *see also* Docket 56-66. The showers are cleaned on a regular basis
with cleaning solutions containing bleach. Docket 68 ¶ 76. The Office of State
Engineer and Office of Risk Management inspect MDSP annually for "hazard
identification" and have never reported the shower areas being "full of black
mold." *Id.* ¶ 77.

Kader has failed to establish that he faced a significant or excess risk to
his health because of the humidity of the showers or the alleged mold. Kader

never reported symptoms stemming from the alleged mold to Health Services and never sought medical treatment related to the alleged mold. Docket 68 ¶ 78. Kader has not shown that he faced a substantial risk because of the alleged mold or that he has suffered any harm because of the alleged periodic exposure. *Bradley*, 2015 WL 6757022, at *5-6 (citing *Stafford v. DeRose*, 2013 WL 877133, at *6 (M.D. Pa. Mar. 8, 2013)). The record reflects that the showers in MDSP are cleaned on a regular basis, and neither the Office of State Engineer, nor the Office of Risk Management, has reported black mold in the showers.

Kader has failed to demonstrate that he was denied the minimal civilized measure of life's necessities or that he faced an excessive risk to his health as the result of the conditions of his confinement. Thus, defendants are entitled to summary judgment as to the shower sanitation claim of Kader's complaint.

### D. Laundry

Kader alleges that he was subjected to cruel and unusual punishment because of the laundry services at MDSP. Docket 19 ¶ 49. Kader claims that "[l]aundry is frequently returned wet and unclean." *Id.* Kader alleges that "[l]aundry workers are forced to overload machines and cut the drying cycles short because there is too much laundry and not enough machines." *Id.* Kader also claims that "the Department of Corrections began issuing brown boxers to hide urine and fecal stains," after "numerous inmate complaints about underwear coming back unclean[.]" *Id.* ¶ 50.

On January 24, 2018, Kader complained, in an Informal Resolution Request, that his laundry "always comes back wet" and "also comes back occasionally more stained and soiled in appearance than when it left." Docket 68 ¶ 96; *see also* Docket 56-67. On January 30, 2018, prison officials indicated, in an Informal Resolution Response, "[i]f laundry bags are packed according to policy by all inmates, laundry would be returned clean and dry." Docket 68 ¶ 97; *see also* Docket 56-68. Kader then failed to file a Request for Administrative Remedy as required by the grievance process in place at MDSP. Docket 68 ¶ 98. As discussed earlier, Kader needed to have exhausted all his claims through the SDDOC internal grievance process before bringing suit in court. *Sisney*, 2007 WL 951858, at *2. Because Kader failed to exhaust his laundry claims, defendants are entitled to summary judgment as to the laundry claims in Kader's complaint.

**IV. Motion for Reconsideration**

Kader moves for reconsideration (Docket 78) of the court's March 19, 2019 order (Docket 76). On March 19, 2019, the court denied Kader's motion for sanctions (Docket 71) and his motion to appoint counsel (Docket 75) but granted Kader's motion to extend (Docket 74). Docket 76. Kader argues that the court should sanction defendants and should appoint counsel to Kader. Docket 78. After considering the merits of Kader's claims, the court denies Kader's motion for reconsideration.

**CONCLUSION**

Thus, it is ORDERED

1.  Defendants' motion for summary judgment (Docket 55) is granted.

2.  Kader's motion for reconsideration (Docket 78) is denied.

Dated September 5, 2019.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE